ALEXANDER WINNICK, ADMINISTRATOR (ESTATE OF BENJAMIN SLADE) v. OLIVE SLADE PARISH ET AL.

INGLIS, C. J., BALDWIN, WYNNE, CONWAY and COVELLO, Js.

Argued May 4—decided June 17, 1955

*Samuel H. Platcow* and *Samuel A. Persky,* for the appellants (defendants).

*William L. Hadden,* with whom, on the brief, were *William L. Hadden, Jr.,* and *Clarence A. Hadden,* for the appellee (plaintiff).

WYNNE, J. In this action the administrator of an estate seeks to recover stock certificates which the

decedent owned and had in his possession prior to his death. It also concerns the right to the possession of two savings bank books representing accounts which the decedent had opened with his own funds. The latter issue was raised by a counterclaim in which a mandatory injunction was sought requiring the delivery of the bankbooks to the defendants Parish, whose names appeared as beneficiaries of the accounts. The issues were tried to the court and were found for the plaintiff on the complaint and the counterclaim. From this judgment the defendants have appealed. They have assigned errors in the finding, certain rulings on evidence and the conclusions of the court.

The finding comprises 107 paragraphs. A summary of the paragraphs not attacked is as follows: The plaintiff is the administrator of the estate of Benjamin Slade, late of New Haven. Slade died in New Haven on November 1, 1951, at the age of seventy-eight. He had been engaged in the practice of law for a great many years. In addition to his law practice, he had varied business interests. He left a sister, the defendant Olive Slade Parish, and twin nieces, Olive Tejada-Flores and the defendant Helen R. Parish, daughters of Olive Slade Parish, all of whom were residents of California at the time of his death. His only other surviving close relative was a nephew, Samuel Slade, son of a deceased brother.

During the four years prior to his death, Slade was confined to hospitals on nine occasions. From July 16, 1951, until his death he was in a convalescent home in New Haven. When he was admitted to a hospital on January 9, 1950, he was a poorly developed, poorly nourished man. Dr. Louis H. Nahum, a specialist in internal medicine and heart

illnesses, attended him professionally from May, 1951, until his death. During this period the decedent had a lung condition, hypertensive arteriosclerotic heart disease, a disease of the vessels of the legs, and cataracts of the eyes. Dr. Everett S. Rademacher, a specialist in psychiatry, attended the decedent on January 18 and 22, 1951. Dr. I. J. Marshak attended him professionally from April, 1951, to September 10, 1951. At the time of the admission of the decedent to a hospital on July 9, 1951, he was an extremely senile man who had suffered an embolism in the brain, was in a paralyzed condition and had a loss of speech. On July 16, 1951, he was transferred to the convalescent home. While he was there, Dr. Nahum attended him at first once or twice a week and later once or twice a day. During this period the decedent was incapable of discriminatory judgment and was in a condition of progressive mental and physical decline—occasionally completely out of his mind—to the extent that on many occasions he would not recognize Dr. Nahum. He resisted care and attention, could not distinguish between correct and incorrect actions of his own and could not follow a logical train of thought. He could not distinguish between past and present events and did not know whether he was taking his medication. His mentality was extremely poor and he could not recall events of the previous day. He drifted from one thought to another without reason and would forget a matter one moment after it was discussed. A sudden episode of confusion and disorientation occurred on August 10, 1951, and Dr. Bernhard A. Rogowski was called in consultation. At that time the decedent was senile and had suffered a progressive loss of all functions in all organs, especially the brain. Dr. Rogowski is

a specialist in neurology and psychiatry. In the spring of 1951, the decedent had become feeble and wanted to sue Dr. Marshak because he claimed the doctor had made him ill. He had begun to write incoherently.

In the summer of 1950, Theresa V. Brennan, the decedent's secretary, wrote a letter to the defendant Helen R. Parish and in it stated that Dr. Jenkins, at the New Haven Hospital, had suggested that steps be taken to have the decedent committed because of his mental condition and his actions as a patient in the hospital. In the spring of 1951, while the decedent was a hospital patient, he was led into his law office. He was wearing bedroom slippers and said that he had come to sign some papers. There were no papers for him to sign. Weak, incoherent and trembling, he was helped into a cab and taken back to the hospital. On June 29, 1951, the defendant Helen R. Parish came to New Haven from California and stayed until the latter part of September, 1951. From the time of her arrival until the death of Slade, she was in his confidence and occupied a position of trust in relationship to him. She went to his office every day and became familiar with his office affairs. During all of her stay in New Haven, she was aware of the mental and physical condition of the decedent. She told Dr. Rogowski on the occasion of his visit to the decedent at the convalescent home that she wanted to have the decedent committed.

Shortly after September 15, 1951, Louis Weinstein, an attorney, was in the office of Benjamin Slade with the defendant Helen R. Parish. Certain stock certificates were placed on the table by Miss Brennan, Slade's secretary. There were no indorsements in Slade's name on the backs of the certificates. Re-

ferring to them, Helen R. Parish asked, "If I get Uncle Ben to sign these certificates, will they be mine?" Weinstein replied, "Well, I'm not so sure about that." She then said, "Well, possession is nine-tenths of the law, isn't it?" Referring to a certificate in the name of Dorothy S. Rodney and to one in the name of Eugene Rodney, Helen R. Parish asked Weinstein, "Do these certificates have to be endorsed for me to get title to them?" During the conversation, when Weinstein told her that if Slade died Samuel Slade would be an heir, she said, "Yes I know that, but I don't want him to get anything out of it."

The court's conclusions were that the decedent was infirm, feeble, weak, in ill health and of unsound mind for a long time prior to his death; that his mind and memory failed him; and that he was mentally incapable of carrying on his affairs, of knowing what he was doing and of understanding the force and effect of what he was doing. It was further expressly found that on September 24 and 25, 1951, he did not possess the mental capacity required for the exercise of judgment. The court concluded that the defendant Helen R. Parish set out upon a plan to get from him all he had, that she knew his condition of body and mind and that she spent her time carrying out her plan from her arrival in New Haven until she thought she had accomplished her purpose.

Against the factual background as recited above, which stands unchallenged, the case hinges on the court's conclusion that on September 24 and 25, 1951, Slade lacked mentality to know and to appreciate what he was doing. It was on the former date that he signed the stock certificates which had stood in his name and made delivery of them to the

defendant Helen R. Parish. It was on the latter date that he went, in company with Helen R. Parish, to the First National Bank and Trust Company and participated in arrangements there for the rental of a safe deposit box in the name of Helen R. Parish and her mother, Olive Slade Parish. Slade was named as deputy on the rental agreement, and he signed the bank record to effectuate this arrangement. The stock certificates in question were placed in the safety deposit box. As of these two dates, there was conflicting testimony concerning Slade's mental capacity. Miss Brennan, his secretary for more than thirty years, testified that on September 24, 1951, when the stock certificates were signed, Slade did not know what he was doing and lacked mental capacity. Was the trial court justified in accepting her testimony? The answer to this question is controlling on the aspect of the case having to do with the transfer of stock certificates.

The defendants, in their assignment of errors, have made a sweeping attack upon the finding. They claim that the court erred in refusing to find material facts as set forth in 175 paragraphs of their draft finding. They seek to have the draft finding substituted for the salient details of the finding. This cannot be done where the evidence is conflicting and the finding as made has support in the evidence. *Eastern Sportswear Co.* v. *S. Augstein & Co.*, 141 Conn. 420, 422, 106 A.2d 476. Of the many questions raised in the assignment of errors, only those which have been argued orally or in the brief need to be considered. *Harris* v. *First National Bank & Trust Co.*, 139 Conn. 749, 753, 97 A.2d 260; Maltbie, Conn. App. Proc., § 165. The defendants claim over 250 errors, but it is clear that the correctness of the court's findings concerning Slade's men-

tal disability when he signed the stock certificates is in reality the sole issue on this aspect of the case. There was testimony both ways. The court accepted the testimony of Miss Brennan and, against the background of undisputed facts, was justified in so doing. It is one of the important functions of a trier to determine the relative credit to be given to oral evidence. *Eastern Sportswear Co.* v. *S. Augstein & Co.,* supra.

The defendants claim that in this case the finding was based to a great extent upon opinions expressed by witnesses for the plaintiff. It is true that opinions lack persuasive force unless based on facts. The defendants rely on *Maroncelli* v. *Starkweather,* 104 Conn. 419, 424, 133 A. 209. The answer is that in the case at bar the opinions expressed find ample support in the unchallenged finding, which is replete with facts that were found to exist. The cumulative significance of the facts found is a sufficient backdrop for the events that took place in Slade's office on September 24, 1951. Miss Brennan testified that at that particular time Slade lacked the mental ability to comprehend what he was doing. We have said that it was this precise moment that is important. *Jackson* v. *Waller,* 126 Conn. 294, 302, 10 A.2d 763.

The defendants have assigned error in several rulings on evidence. None of the rulings to which exception was taken at the trial constitute reversible error.

On January 6, 1950, the decedent opened an account in the name of "Benjamin Slade, Trustee for Mrs. Olive Slade Parish & Miss Helen Rand Parish equally & to the survivor," in the amount of $10,000, with the Connecticut Savings Bank in New Haven. On the same day he opened another account, in the

amount of $5000, in the name of Benjamin Slade alone. Subsequent to his death, forms described as "Owned by Beneficiary Forms," dated January 5, 1950, signed by the decedent, bearing the account numbers of the two accounts hereinbefore referred to, and naming the defendants Parish as beneficiaries, were found among the records of the bank. No further deposits and no withdrawals were made in either of these accounts. At all times, with the exception of a few hours on September 25, 1951, the books were in the possession and control of the decedent, and no one else had the right to withdraw any funds from these accounts. On September 25, 1951, the books were in the possession of the defendant Helen R. Parish, who returned them to the decedent's secretary at his law office so that, as Helen R. Parish stated, if Slade wanted to put more money in the accounts, he would have the books to do so. The defendants claim that these facts establish an inter vivos gift to them. It does not appear that the decedent ever intended to surrender to the defendants his control over the bankbooks or that they were ever delivered to the defendants with the intention of making a present gift. The elements of a valid inter vivos gift of the bank accounts were not present. *Kriedel* v. *Krampitz,* 137 Conn. 532, 534, 79 A.2d 181. Whether the circumstances were such that Slade had actually set up revocable trusts is of no moment. The only issue concerns the court's conclusion that the bankbooks found in Slade's effects need not be turned over by his personal representative to the defendants Parish.

There is no error.

In this opinion the other judges concurred.